SCHENCK, J., took no part in the consideration or decision of this case.
This is an action instituted by the plaintiff against the defendant to recover disability benefits provided for in two policies of insurance *Page 761 
theretofore issued to him and for the waiver of the premiums under said policies during his disability. The evidence of the plaintiff, is to the effect that on 28 April, 1925, defendant issued to plaintiff its policy of insurance upon his life in the sum of $5,000, the same being policy No. 309013, and thereafter, on 29 September, 1926, the defendant issued unto plaintiff another policy of insurance upon his life in the sum of $5,000, being policy No. 328166. Attached to and forming a part of said policies of insurance were contracts providing for total and permanent disability benefits and a waiver of the payment of premiums during such disability. The premium on the first policy was due on 10 October, and on the second policy on 12 October, 1930. These premiums were extended by the defendant and on 23 January, 1931, the defendant extended the payment of the balance of the premium due under the first policy until 10 July, 1931, and on the second policy until 12 July, 1931, in consideration of a stipulated payment at that time. At the time of the extension agreement the defendant executed and delivered unto the plaintiff its receipt and agreement, in which it provided that in case said policy of insurance terminates by death before the expiration of the extension the balance of the full annual premium will be charged against the policy or should it terminate from any other cause, a pro rata premium will be charged against any benefits that may accrue thereunder. The evidence is further to the effect that during the life of the two policies of insurance and beginning sometime the latter part of March, the plaintiff suffered a severe and serious attack of destructive arthritis of the third lumbar vertebra, which is an infectious process or eating away of the vertebra, which is the backbone; that he suffered a great deal of pain and agony and was continuously thereafter under the influence of powerful narcotics in an effort to alleviate his suffering, and during all of said time was totally incapacitated and unable to carry on or to transact any business; that he was suffering unbearable pain, confined to his bed wrapped in blankets, using electric pads and other devices to alleviate his sufferings. That the disease had affected his mind to such an extent he was not able to carry on any business and did not see any mail or papers; that he did not realize he had any insurance on his life; that this had never crossed his mind until Dr. Dewar mentioned the matter to his wife about 27 July; that he was totally unable to carry on any matters of business or to realize that he had a policy of disability insurance, and this condition existed throughout the entire period until about 27 July, and about seventeen days after the due date of the extended premium. During all this period of time he received no notice from the defendant that any premium on his policies of insurance was due, and it was not until 27 or 28 July, that the attention of his wife was called to any insurance when it was suggested by Dr. Dewar to her that if plaintiff had any disability *Page 762 
insurance he should be drawing the insurance as he had been totally disabled for more than ninety days, and on that day she notified Mr. Rand, a relative of plaintiff and an attorney, who resides at Wilson, to come down and give the defendant notice of the mental and physical condition of plaintiff, which he did, and since that date, the plaintiff has continued to suffer to such an extent that he is unable to engage in any occupation or perform any work for compensation or profit. The disability provided that after one full annual premium shall have been paid under the policies and before default in the payment of any subsequent premium or installment thereof, if due proof shall be furnished the company at its home office in the city of New York that the insured has become totally and permanently disabled before the anniversary of the policy on which his age at nearest birthday is sixty. "(1) To waive the payment of annual premiums which may fall due under the said policy and under this contract during the continuance of such disability, commencing with the premium due on the anniversary of the policy next succeeding the date of receipt of such due proof. (2) To pay to the insured a monthly income of one per centum of the face amount of the policy during the continuance of such disability, the first income payment to become due on the first day of the calendar month following the date of receipt of such due proof."
The judgment of the court below, reciting the issues and their answers thereto, is as follows: "This cause coming on to be heard at this the third March Term, 1933, of the Superior Court of Wake County, and being heard before his Honor, E. H. Cranmer, and a jury and the following issues having been submitted to the jury in the first cause of action, to wit: (1) Has plaintiff had since 1 April, 1931, any impairment of body or mind which continues to render it impossible for him to follow any occupation or perform any work for compensation or profit? (2) If so, is such disability permanent as defined in said policy? (3) If he became so disabled prior to 10 July, 1931, was he incapable of and unable to make payment of premiums and to furnish proof of disability as required by the terms of the policy? And the jury having answered each of said issues, `Yes' and counsel representing plaintiff and defendant having agreed that a fourth issue reading as follows, to wit: (4) What amount, if any, is defendant indebted to plaintiff by reason of his first cause of action? Should be answered by the court if the other issues should be answered `Yes': `$50.00 per month beginning with the first day of August, 1931, and continuing through the first day of October, 1932, with interest on each monthly payment from its due date, until paid at the rate of 6 per cent per annum, less $90.00, being balance of premium due on the insurance policy, subject of this controversy, from 10 October, 1930, until 10 October, 1931. By consent the fourth issue submitted to the jury was *Page 763 
eliminated. And counsel representing plaintiff and defendant having further agreed that the two causes of action sued on are identical and that the same and identical issues were raised in the said second cause of action, that therefore the court should answer the issues in the second cause of action in accordance with the answers to the issues in the first cause of action. Now, therefore, it is hereupon ordered, adjudged and decreed: (1) That plaintiff have and recover of the defendant by reason of his first cause of action the sum of $50.00 per month from the first day of August, 1931, to and until the third day of October, 1932, with interest on each monthly payment from its due date until paid at the rate of six per cent per annum. (2) That the defendant subtract and deduct from the amount due the plaintiff the sum of $90.00, it being the balance due by the plaintiff to the defendant for premium on insurance policy and disability, contract, the subject of this action, from 10 October, 1930, to 10 October, 1931. (3) That the plaintiff have and recover of the defendant on the second cause of action, the sum of $50.00 per month from the first day of August, 1931, to and until the third day of October, 1932, with interest on each payment from its due date until paid at the rate of 6 per cent per annum. (4) That the defendant subtract and deduct from the amount due the plaintiff, the sum of $90.00, same being the balance due by the plaintiff to the defendant for the premiums on the policy of insurance, subject of this action, from the 21st day of October, 1930, to the 12th day of October, 1931. (5) That the cost of this action be and the same is hereby taxed against the defendant."
The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be set forth in the opinion.
The defendant introduced no evidence and at the close of plaintiff's evidence, made a motion in the court below for judgment as in case of nonsuit. C.S., 567. The court below overruled this motion and in this we can see no error.
The question involved: For a consideration, the premium due under the first policy was extended by defendant until 10 July, 1931, and on the second policy to 12 July, 1931. About 1 April, 1931, a little over three months before the above premiums were due, the plaintiff had a mental and physical breakdown, which continued until after the premiums were due and continued to a great extent to the trial of the cause and his disability was permanent. Notice the latter part of July, 1931, was given the defendant company of plaintiff's disability. Under the *Page 764 
terms of the policy, was there a forfeiture? We think not. The jury found that the impairment of body and mind was and continued since 1 April, 1931, and he became so disabled prior to the time the premiums were due in July and he was unable to make payments of premiums, etc. The evidence on the part of plaintiff as to his mental and physical breakdown was plenary to sustain the verdict and plaintiff's evidence was to the effect that he was a farmer about 40 years old. He had carried the first policy since 28 April, 1925, and the second since 29 September, 1926. Numa Turner, a witness for plaintiff, testified, in part: "I have known Parker practically all of his life. I know his general character; it is excellent. . . . Prior to March and April, 1931, he had the appearance of being as strong and robust as any person you ever saw, and I know personally that he was one of the hardest working men, if not the hardest working man I ever saw in my life. He always worked. He hasn't been able to do anything since that time."
On the early morning of March, 1931, about 2:30 a.m., the plaintiff was taken "violently ill." Plaintiff testified, in part: "I was suffering terrible pains beginning in my back and going all the way down my legs, causing knots to form in my thigh and in my leg. It was almost unbearable pain. . . . I've suffered intense pain from that day until now. . . . I wasn't able to do anything. I couldn't put my shoes on. I was hardly able to walk. I was suffering such intense pain. I was under the influence of some narcotic the whole time from the first of March on. . . . From the time I saw Dr. Dewar here in April to the 10th day of July, I was getting worse all the time. I was suffering more. I was not able to sleep. I was continuing to have to take narcotics. . . . I took narcotics from March until now, under the direction of doctors. I don't exactly know how much. . . . I happen to know the narcotics I took up to July consisted of morphine, luminal, codein, aspirin and papin. My condition after I saw Dr. Dewar became worse. About the middle of July or the latter part of June, or the first of July, they put me in a cast. The latter part of June and in July I was attended by Dr. Buffalo from Garner. . . . During the months of June and July I was suffering almost unbearable pain. They had me wrapped up in blankets, electric pads and other devices to try to keep me from suffering so. I was confined to my bed during that period of time all the time. I was unable to carry on. The disease, or suffering which I had, affected my mind to such an extent that I wasn't able to carry on any business. I didn't see any of the mail or papers. . . . From that time up to the present time I have been unable to do anything. Well in the latter part of July, I was in such terrible condition that my wife phoned Dr. Dewar to come down to see me down to my home. Dr. Dewar came down. I don't know *Page 765 
the exact date, but I think it was the 26th or 27th of July, or something like that. Dr. Dewar came down and examined me. I was suffering terribly. He gave me a hypodermic of morphine that night while he was there and he asked me or asked my wife in my presence — he was not talking to me — but asked her in my presence if I had any insurance. She told him I did, but that she didn't know anything about the policy. He told her `You had better look them up and see if they carry any disability clause.' Up to that time, the 27th or 28th of July, I had not received any notices from the insurance company of the due date of my premiums. The condition of my mind was such from my suffering that I did not realize I had any insurance on my life. It had never crossed my mind until Dr. Dewar mentioned it, the night he was there. . . . During that time I was suffering intensely, almost unbearable pain, so that sweat was popping out on me like a mule in May. I was not able to carry on any business transactions of any nature. . . . In the latter part of September he brought me to Raleigh and took my tonsils out. Later they extracted my upper teeth. On the first of December, Dr. Dewar and Dr. Hugh Thompson put a plaster cast on me from my hips to my neck down at the Rex Hospital. . . . I was then removed to my home with a plaster cast on me. It stayed on me for three months. During that time, I wasn't able to move. I was at home in bed. I was confined to my bed over that period of time. . . . They took the cast off 1 March, 1932. From 1 March, 1932, up to the present time, I have been gradually getting worse. . . . I now have to take something to sleep. I am unable to sleep unless I take some narcotic. In fact, now, I am still taking codein, luminal, and aspirin in capsules. When I am without the codein, luminal and aspirin, I can't go to sleep, I hurt so bad. I toss from side to side when I go to bed. That condition exists up to now. I have not been able since the latter part of February, 1931, to perform any kind of work for profit. I have not made one cent of money. . . . I have not been able to do any work of any nature since March, 1931. That condition has continued with me throughout this entire period of time. I have not received any compensation of any kind for any work performed by me during that period of time. I am not now able to perform any kind of work."
Dr. William B. Dewar testified, in part: "I made another X-ray of him. Dr. Thompson, whom I had see him, after we had found a destructive arthritis of the third lumbar vertebra, and I agreed that he had this destructive arthritis of that vertebra. It is an infectious process, or eating away, of one of the vertebrae, which is the backbone, not in the sense that the whole thing is destroyed. Only a small portion of it is destroyed." *Page 766 
Mrs. J. J. McMahon, testified, in part: "It really seemed to me that he had grown worse. I think his mental condition was worse because his pain was growing worse all the time. At that time, 4 July, 1931, he was not able to carry on any business of any kind. When I was here, he was not able to read a newspaper, nor was he able to carry on a connected conversation. He was not able to carry on any business in April and May, when I was here. I was just here for the 4th of July. I was home again in August. I came especially to see him. He was suffering at that time just as much as he had been previously."
Miss Sarah Rand, a graduate nurse, testified, in part: "Opiates were administered to him every four hours and some times more than that; at night especially; we would have to give him at least a half grain of morphine to relieve him at times. He was suffering so he didn't pay any attention to anything. He couldn't talk to me on any subject; not even about his condition. He did not attend to any business matters while I was there from 16 June through the summer. I was there from 1 July through 12 July. He did not attend to any business matters over that period. Q. Do you have an opinion as to whether he had sufficient mental ability to attend to any business matters over that period? That is from 1 July through 12 July? Answer: Yes, sir. Q. In your opinion, Miss Rand, did he over that period from 1 July through 12 July have sufficient mental capacity to transact his business in connection with the farm and in connection with his affairs there about his place and to know what he was about? Answer: No. He was taking opiates, narcotics, morphine, codein every four hours over the period of time from 1 July to 12 July, he took it all the time I was there. Q. Do you have an opinion satisfactory to yourself as to what his mental condition was over that period of time? Answer: He was suffering such intense pain he could not discuss anything and when he took hypodermics he was in no condition to discuss any business matters or anything around the home of any kind or about the family. He was confined to his bed continuously from 1 July to 12 July."
Mrs. Parker Rand testified, in part: "During the months of June and July, up to 10 July and 12 July, my husband's condition wasn't normal. It was not normal, I should say. His mind was distraught by the fact that he was in terrible pain; also when he wasn't suffering such excruciating pain it had to be deadened by the narcotics and consequently the narcotics affected his mind. He was in that condition all during July. . . . I did not know that he had any health insurance. During the interval of time when he was there in bed, as I stated just now, he was not in any condition to transact any business of any kind, he couldn't read a newspaper intelligently. He could not read his mail. I did not allow him to have his mail. He was not able to transact any business from 1 July to 13 July." *Page 767 
The condition of plaintiff seems to have been worse than Job, the example of patience, "smote Job with sore boils from the sole of his foot unto his crown." Job, chapter 2, part verse 7. Job's affliction was physical — plaintiff's affliction was mental and physical. The defendant contends that under the terms of the policy, the premiums due on 10 and 12 October were not paid, therefore the policy was null and void and of no effect. We cannot so hold, under the facts and circumstances of this case.
Under sufficient, competent evidence the issues were answered "Yes," in plaintiff's favor. In the judgment is the following: "And counsel representing plaintiff and defendant having further agreed that the two causes of action sued on are identical and that the same and identical issues were raised in the said second cause of action, that therefore the court should answer the issues in the second cause of action in accordance with the answers to the issues in the first cause of action."
The decisions on the question in controversy, in the different states, are conflicting, but we think it is settled in this State by the humanitarian decision written by the Chief Justice in Rhyne v. InsuranceCo., 196 N.C. 717 (719): "But we are content to place our decision on the broad ground that, notwithstanding the literal meaning of the words used, unless clearly negatived, a stipulation in an insurance policy requiring notice, should be read with an exception reasonably saving the rights of the assured from forfeiture when due to no fault of his own, he is totally incapacitated from acting in the matter. That which cannot fairly be said to have been in the minds of the parties, at the time of the making of the contract, should be held as excluded from its terms. Comstock v. FraternalAccident Association, 116 Wis. 382, 93 N.W. 22. The primary purpose of all insurance is to insure, or to provide for indemnity, and it should be remembered that, if the letter killeth, the spirit giveth life. Allgood v.Insurance Co., 186 N.C. 415, 119 S.E. 561; Grabbs v. Insurance Co.,125 N.C. 389, 34 S.E. 503."
The Rhyne case was before this Court again, 199 N.C. 419. The same principle was laid down, that failure to give immediate notice of disability will not work forfeiture where insured is incapable of giving such notice.
In Mewborn v. Assurance Corp., 198 N.C. 156, and in Nelson v.Insurance Co., 199 N.C. 443, the Rhyne case was cited with approval, by a unanimous Court. In the Nelson case, supra, at page 447, we said: "In 2 C. S., under insurance, subchapter 5, accident and health insurance, C.S., 6479, dealing with standard provisions in policy under subsec. 5, is the following: `Failure to give notice within the time provided in this policyshall not invalidate any claim, if it shall be shown not to have beenreasonably possible to give such notice and that notice *Page 768 was given as soon as was reasonably possible.' (Italics ours.) It will be noted that under the standard provisions in policies, where time limit is fixed, yet the General Assembly realizing that a hard and fast rule should not always be applied, put in the above provision to meet varying contingencies that might arise."
The defendant contends that the court below committed error in permitting plaintiff to introduce in evidence policy No. 335782, issued on 14 May, 1927, and to testify with regard to the payment of benefits under this policy. We cannot so hold. The policy in question was similar in all respects to the two policies of insurance, the subject of this action, and the disability contracts attached were in all respects similar except what is contained in a letter of 23 January, 1931, which we do not think sufficiently material to affect the situation. We think that this was a circumstance and some evidence in the nature of an admission. The facts to establish defendants' liability were practically the same under all the policies. At least it was not such prejudicial error that would call for a new trial. The defendant contends that the court below committed error in refusing to submit issues tendered by the defendant and the issues as submitted. We cannot so hold. The issues submitted were framed to cover the decisions of this Court as before set forth. The defendant introduced no evidence and we think the court below charged the law applicable to the facts fully as required by C.S., 564. For the reasons given, we find
No error.
SCHENCK, J., took no part in the consideration or decision of this case.